Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 7125 | **DATE** | 12/13/2001 |
| **CASE TITLE** | Binder vs. Bristol-Myers Squibb Co., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. Plaintiff's complaint is dismissed with prejudice against Defendant Bristol-Myers Squibb Co.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 1 4 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 29 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/12/2001 | |

| DK | courtroom deputy's initials | FILED FOR DOCKETING 01 DEC 13 PM 4: 23 | date mailed notice | |
|---|---|---|---|---|
| | | Date/time received in central Clerk's Office | DK mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| SANDRA J. BINDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 97 C 7125 |
| v. | ) | |
| | ) | Magistrate Judge Morton Denlow |
| BRISTOL-MYERS SQUIBB, CO., | ) | |
| a corporation, and MEDICAL | ) | |
| ENGINEERING CORPORATION, | ) | |
| d/b/a SURGITECH, a corporation, | ) | |
| | ) | DEC 1 4 2001 |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case raises the issue of whether defendant, Bristol-Myers Squibb, Co. ("Defendant" or "BMS") is liable for the acts of Edward Weck & Co. ("Weck") in distributing an alleged defective mammary prostheses implanted in plaintiff, Sandra J. Binder ("Plaintiff" or "Binder"). Defendant claims Plaintiff has not sued the correct defendant.

Because the Defendant has contested whether it has any liability, the parties have agreed to have this issue decided prior to dealing with the issues related to the merits. This case comes before the Court by means of a trial on the papers in which the parties have submitted trial briefs, affidavits and supporting exhibits which constitute the record in this case. *See* Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment,* Federal Lawyer, August 1999, at p. 30. *See also, May v. Evansville-Vanderburgh Sch. Corp.,* 787 F.2d 1105, 1115-16 (7th Cir. 1986); *Allen v. United Mine Workers of America,* 726 F.2d 352, 353 (7th Cir. 1984); *Acuff-Rose Music Inc. v. Jostens, Inc.,* 155 F.3d 140, 142

(2nd Cir. 1998); *Nolan v. City of Chicago*, 125 F. Supp.2d 324, 325 (N.D. Ill. 2000). The parties have agreed to proceed in this manner and to waive their right to present in court testimony. Oral argument was held on December 4, 2001.

Plaintiff has filed a four count Complaint against Defendants alleging: 1) unreasonably dangerous conditions, 2) negligence, 3) breach of implied warranty of merchantability, and 4) breach of implied warranty of fitness for a particular purpose. Plaintiff's allegations arise out of her claim that her breast implants caused her severe physical health problems.

The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed to be conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed to be findings of fact, they shall be considered findings.

## I. <u>FINDINGS OF FACT</u>

### A. Parties

1. Plaintiff is a 54 year old woman who underwent breast augmentation surgery on July 13, 1970 receiving mammary prostheses in both breasts. (Pl. Resp. ¶ 1;[1] Def. Ex. A). Plaintiff is currently a resident of the State of Illinois and was a resident of the state of Illinois at the time the complaint was filed. (Def. Notice for Removal, ¶ 3).

---

[1] "Pl. Resp." refers to Plaintiff's Proposed Findings Of Fact And Conclusions Of Law.

2. BMS was created in 1988 after the merger of Bristol-Myers and E.R. Squibb & Sons ("Squibb"). (Def. Brief p. 1). At the time this action was commenced and at the present time, BMS was a Delaware corporation with its principal place of business in the State of New York. (Def. Notice of Removal, ¶ 4). Medical Engineering Corporation d/b/a Surgitech ("MEC") was a Delaware corporation with its principal place of business in the State of Wisconsin both at the time this action was commenced and at the present time. (*Id*. at ¶ 5).

## B.     Breast Implants

3. Plaintiff underwent surgery and was implanted with mammary prostheses on July 13, 1970. (Pl. Resp. ¶ 1; Def. Ex. A). Dr. Greenburg, the assisting surgeon, described the implants as "Weck prostheses" in Plaintiff's chart. (Def. Ex. A). These implants are at issue in this case.

4. On May 28, 1993, Plaintiff underwent surgery to remove both prostheses and immediately received new saline implants to replace those that were explanted. (Def. Ex. B). The 1993 implants are not at issue in this case.

5. Dr. Michael Middleton, MD, a radiologist at UC San Diego and Plaintiff's product identification expert examined the original implants. (Def. Ex. C). Dr. Middleton, in a report dated April 22, 1997, concluded plaintiff's original prostheses were most probably manufactured by Polyplastic Silicone Products, Inc. ("Polyplastic"). (*Id*.).

6. Dr. Pierre Blais, an expert on the history and composition of the breast implant industry, also examined Plaintiff's original implants. (Def. Ex. D). In Dr. Blais' report dated

March 1, 2001, he opined that Plaintiff received "Ashley" Natural Y implants and also believed them to be manufactured by Polyplastic. (Def. Ex. D). Dr. Blais also explained the connection between Polyplastic and Weck. In the late 1960's, Polyplastic struck distribution agreements with Weck, who had responsibility for labeling, marketing and post-market follow up. (Def. Ex. D, p. 2). The implant was then known as the "Weck Natural-Y Mammary Prosthesis." (*Id.*).

## C.    Corporate Time Line

7. At the time of the implant in 1970, Weck was a wholly-owned subsidiary of Standard International Corp. ("Standard"). (Def. Ex. D, p. 16).

8. On February 17, 1971, Squibb initiated the acquisition of Weck from Standard, Weck's parent corporation. (Def. Ex. F; Def. Ex. G). The parties to the Stock Agreement (Def. Ex. F) included Squibb; Squibb Beech-Nut; ERS, Inc. (the "Squibb Subsidiary"); Weck; and Standard. (Def. Ex. F, p. 1).

9. On February 17, 1971, an Agreement and Plan of Merger (Def. Ex. G) was entered into between the Squibb Subsidiary and Weck providing for the merger of the Squibb Subsidiary with and into Weck. (Def. Ex. G, p. 1).

10. On February 24, 1971, Squibb assigned its rights under the Stock Agreement to Squibb Beech-Nut. (Pl. Ex. A).

11. The merger of the Squibb Subsidiary into Weck became finalized on May 26, 1971. (Def. Ex. G, p. 17-20). Thus, Weck became the wholly-owned subsidiary of Squibb.

12. In 1988, Bristol-Myers and Squibb merged creating BMS. (Def. Brief p. 6).

13. In 1993, Weck entered into an Asset Purchase Agreement with Teleflex Incorporated ("Teleflex"). (Def. Ex. L).

14. Weck continues to exist under the new name of EWI Corporation ("EWI"); however, Teleflex operates Weck's prior business through a subsidiary known as Pilling-Weck. (Def. Brief, p. 6; Def. Ex. I, J). Presently, EWI is duly incorporated under the laws of the State of Delaware, is in good standing, and has a legal corporate existence. (Def. Ex. K).

15. At the time Plaintiff received her implants, Weck was not a subsidiary of Squibb, Squibb Beech-nut, Bristol-Myers, or any related company. (Pl. Resp. ¶ 4). Furthermore, any liability of these entities arises from the actions of Weck in distributing and selling the original implants. (Pl. Resp. ¶ 3).

**D.    Stock Agreement**

16. On February 17, 1971, Squibb, Squibb Beech-Nut, the Squibb Subsidiary, Weck, and Standard entered into a Stock Agreement setting forth representations, warranties, and agreements which each of these respective corporations made in connection with the merger of the Squibb Subsidiary and Weck. (Def. Ex. F, p. 2).

17. In the Stock Agreement, Weck agreed between the date of the agreement, February 17, 1971, and the effective date, May 26, 1971, it would not, without the consent of Squibb, incur or become subject to "any indebtedness, liability or obligation except current liabilities and obligations incurred in the ordinary course of business." (Def. Ex. F, p. 8).

18.  Weck further agreed it received no notice of, or otherwise had "any reason to believe that there exists, any claim or threatened claim of any such liability or obligation" (referring to failure / alleged failure of a product to conform to specifications, contract terms, or satisfying warranty and negligence).  (*Id*. at 21).

19.  Standard agreed, if notified by Squibb, Squibb Beech-Nut, or the Squibb Subsidiary, in writing with in two years from the effective date, the following:

> [I]f Weck or any consolidated subsidiary shall be liable for or shall discharge or pay any claim, liability or obligation or alleged liability or obligation of any nature whatsoever . . . attributable to the period prior to the Effective Date, or if it shall otherwise breach any representation or warranty to, or agreement with, Squibb Beech-Nut, Squibb or the Squibb Subsidiary, Standard will transfer to Squibb Beech-Nut on demand such number of shares of Squibb Beech-Nut Common Stock . . . as shall be worth 100% of (or, if Standard shall not own sufficient shares of Squibb Beech-Nut Common Stock for such purposes, Standard will transfer to Squibb Beech-Nut on demand cash in an amount equal to) (i) the amount of such claim, liability or obligation or the amount of the loss to Weck, Squibb or Squibb Beech-Nut in connection with such breach and (ii) all the expenses (including legal and accounting fees and expenses) incurred by Weck, Squibb or Squibb Beech-Nut in connection therewith, all net of tax benefit if any.

(*Id*. at 46-47).

### E.  Agreement and Plan of Merger

20.  The Squibb Subsidiary and Weck entered into a separate Agreement and Plan of Merger (Def. Ex. G) providing for the merger of the Squibb Subsidiary with and into Weck. (Def. Ex. G, p. 1). The Squibb Subsidiary and Weck were referred to as the "Constituent Corporations." (*Id*.)  The name of the "Surviving Corporation" continued to be Edward Weck & Company, Inc. ("Weck").  (*Id*. at 3).  Furthermore, the Agreement and Plan of Merger provided

> [T]he identity, existence, purposes, powers, objects, franchises, privileges, rights and immunities of Weck shall continue in effect and unimpaired by the merger, and the corporate franchises, existence and rights of the *Squibb Subsidiary shall be merged into Weck* and Weck shall, as the Surviving Corporation, be fully vested therewith. The separate existence and corporate organization of the Squibb Subsidiary . . . shall cease when the merger shall become effective.

(*Id.*) (Emphasis added).

21. The manner and basis of converting or exchanging shares of stock was as follows: Each share of Common Stock, par value $1 per share, of the Squibb Subsidiary was converted into one share of Common Stock, par value $1 per share, of the Surviving Corporation. (*Id.* at 5). Each share of Common Stock, par value 10¢ per share, of Weck was exchanged for 0.252 of a share of Common Stock, par value $1 per share, of Squibb Beech-Nut. (*Id.* at 5).

22. The Agreement and Plan of Merger further stated the Surviving Corporation, Weck, would be

> [L]iable for all debts, liabilities, obligations, duties and penalties of each of the Constituent Corporations, and all said debts, liabilities, obligations, duties and penalties shall thenceforth attach to the Surviving Corporation and may be enforced against it to the same extent as if said debts, liabilities, obligations, duties and penalties had been incurred or contracted by it.

(*Id.* at 10).

## F.    Assignment Of Rights In Stock Agreement

23. On February 24, 1971, Squibb assigned its rights under the Stock Agreement to Squibb Beech-Nut with the following Assignment:

> E. R. Squibb & Sons, Inc., a Delaware corporation ("Squibb"), having transferred all the common stock of ERS, Inc., a Delaware corporation ("ERS"), to Squibb Beech-Nut, Inc., a Delaware corporation ("Squibb Beech-Nut") hereby assigns and transfers to

Squibb Beech-Nut all of the rights of Squibb under the Agreement dated as of February 17, 1971 among Squibb, Squibb Beech-Nut, ERS, Edward Weck & Company, Inc., a Delaware corporation ("Weck") and Standard International Corporation, a Delaware corporation, relating to the merger between ERS and Weck, and Squibb Beech-Nut hereby assumes all of Squibb's liabilities and obligations under said Agreement.

(Pl. Ex. A).

### G.    Procedural History

24.   Plaintiff originally filed her Complaint at Law on September 3, 1997 in the Circuit Court of Cook County, Illinois Case Number 97 L 10481; however, Defendants removed the case to this Court on October 10, 1997. On December 30, 1997, the Multi District Litigation ("MDL") Panel transferred the case to the District Court for the Northern District of Alabama. The case was then referred back to this Court and all parties consented to this Court's jurisdiction to decide whether Defendants are proper parties to this litigation.

25.   The governing law of both the Stock Agreement and the Agreement and Plan of Merger is the internal laws of the State of Delaware. (Def. Ex. F, p. 48; Def. Ex. G, p. 14).

26.   Plaintiff voluntarily dismissed Defendant Medical Engineering Corporation, d/b/a Surgitech with prejudice on December 12, 2001, because it had no facts by which to implicate it.

## II. ISSUE PRESENTED

The issue presented to this Court is whether BMS is liable for the alleged acts of Weck with respect to the Polyplastic implants, having acquired Weck subsequent to the implantation of Plaintiff. For the following reasons, this Court holds BMS is not liable for the alleged acts

of Weck with regard to Plaintiff and will be dismissed, with prejudice, from this action. Furthermore, Defendant MEC was voluntarily dismissed from this litigation with prejudice.

## III. <u>CONCLUSIONS OF LAW</u>

### A. Jurisdiction

This Court has jurisdiction based on 28 U.S.C. § 1332(a), diversity of citizenship. This case was removed to this Court pursuant to 28 U.S.C. § 1441.

### B. Plaintiff Bears The Burden Of Proving She Has Sued The Correct Defendant

In a civil suit, the burden of proof is usually on the Plaintiff because "it is the Plaintiff who is asking the court to alter the status quo and it is therefore fair that he should have the burden of proving the facts in support of his demand." 21 Charles Alan Wright & Kenneth W. Graham, *Federal Practice & Procedure: Evidence* § 5122 (3rd ed., 2001 Supp.). Additionally, the party asserting the "affirmative of an issue has the burden of proving the facts essential to its claim." *Auburndale State Bank v. Dairy Farm Leasing Corp.*, 890 F.2d 888, 893 (7th Cir. 1989). In other words, the burden is on the party who would lose if no evidence were presented. *Id.*

In this case, Plaintiff bears the burden of proving she has sued the correct defendant. Plaintiff asserted the claim against BMS, and, therefore, it is her burden to establish BMS is the proper defendant to this matter.

## C. Defendant MEC Was Voluntarily Dismissed From This Litigation With Prejudice

Plaintiff voluntarily dismissed with prejudice Defendant MEC from this litigation. Therefore, this Court does not need to address the issue of liability with regard to Defendant MEC.

## D. Defendant BMS Is Not Liable For The Premerger Acts Of Weck

Federal Rule of Civil Procedure 17(b) provides, the capacity of a corporation to be sued shall be determined by the law under which it was organized. In this case, both Squibb and Weck were organized pursuant to Delaware law. Furthermore, both the Stock Agreement and the Agreement and Plan of Merger contain Delaware choice of law provisions. Therefore, Delaware law governs the issue of whether Defendant assumed Weck's liabilities.

This Court must first decide whether Squibb agreed to assume Weck's liability. The next issue is whether the merger between the Squibb Subsidiary and Weck can be characterized as a *de facto* merger, a reverse triangular merger, or does not need to be labeled at all. If the Court reaches the conclusion of a *de facto* merger, then liabilities of the past attach to Squibb and subsequently to BMS. If however, the Court concludes a *de facto* merger did not occur then, the Court must next decide whether a wholly-owned subsidiary subjects its parent corporation to liability for the actions of the subsidiary.[2]

Before beginning with the analysis, it is helpful to have a working definition of some of the terms. The "constituent corporations" are those corporations that are the actual

---

[2] The Court's determination of whether or not the merger was a reverse triangular merger has no bearing on the issue of a parent corporation's liability for its subsidiary.

corporations merging. Balotti and Finkelstein, *The Delaware Law of Corporations and Business Organizations*, § 9.2 (Aspen Law & Business 1998). The term does not include the parent or other affiliate of one of the merging corporations even though the parent may have signed the merger agreement and its stock may constitute the merger consideration. *Id.* The "surviving" corporation is the constituent corporation that, after a merger, continues in existence and into which the other constituent corporation is merged. *Id.* Thus, in a merger, one or more constituent corporations merge into and become part of another constituent corporation that continues its existence, the surviving corporation. *Id.*

### 1.   Squibb Did Not Assume Weck's Liability

Documentation for this merger is found in two agreements, executed simultaneously on February 17, 1971 – the Stock Agreement (Def. Ex. F) and the Agreement and Plan of Merger (Def. Ex. G). The Stock Agreement identifies the parties involved in the purchase and sale of Weck to Squibb and provides for the exchange of shares of stock information. Def. Ex. F, p. 1. The Stock Agreement contains numerous recitals and warranties regarding the legal status of the parties and their ability to cause the merger agreement to be completed; it does not, however, contain any provision by which Squibb or Squibb Beech-Nut agreed to assume premerger liabilities of Weck. Def. Ex. F.

By contrast, the Agreement and Plan of Merger (Def. Ex. G) involved only two parties: the Squibb Subsidiary and Weck. Def. Ex. G, p. 1. The agreement provided for the Squibb Subsidiary to be *merged with and into Weck*, with the name of the surviving corporation to be

Edward Weck & Company, Inc. *Id.* at 3 (emphasis added). Furthermore, the agreement set forth "the identity, existence, purposes, powers, objects, franchises, privileges, rights and immunities of Weck shall *continue in effect and unimpaired by the merger*, and the corporate franchises, existence and rights of the *Squibb Subsidiary shall be merged into Weck* and Weck shall, as the Surviving Corporation, be vested therewith." *Id.* (Emphasis added). Lastly, the agreement stated all liabilities of Weck and the Squibb Subsidiary would survive and become the liabilities of the surviving corporation, Weck. *Id.* at 9-11. The agreement did not provide for any assumption of Weck's liabilities by Squibb, either directly or by virtue of its status as the sole stockholder of the Squibb Subsidiary or the merged corporation.

## 2. The Merger Of The Squibb Subsidiary Into Weck Cannot Be Characterized As A *De Facto* Merger

Plaintiff places all her eggs in one basket arguing what took place between Squibb and Weck was a *de facto* merger. Delaware courts, however, recognize the *"de facto* merger" doctrine only in very limited contexts. Balotti and Finkelstein at § 9.3. In only a few instances involving sales of assets have Delaware courts applied the doctrine of *de facto* merger and only then "for the protection of creditors or stockholders who have suffered by reason of failure to comply with the statute governing such sales." *Heilbrunn v. Sun Chem. Corp.*, 150 A.2d 755, 758 (Del. 1959); *Drug, Inc. v. Hunt*, 168 A. 87 (Del. 1933); *Finch v. Warrior Cement Corp.*, 141 A. 54 (Del. Ch. 1928).

A *de facto* merger may be found where an asset sale took place that amounted to a merger. *See, e.g. Hariton v. ARCO Electronics, Inc.*, 182 A.2d 22, 27 (Del. Ct. of Chanc. 1962)

(holding the transaction was "not a de facto merger, either in the sense that there was a failure to comply with one or more of the requirements of § 271 of the Delaware Corporation Law, or that the result accomplished was in effect a merger entitling plaintiff to a right of appraisal.) Similarly, in evaluating *in personam* jurisdiction, the Court, in *Fehl v. S.W.C. Corp.*, 433 F.Supp. 939, 944-48 (D.Del. 1977), found Plaintiff did not satisfy its burden of establishing that a series of two party asset sales amounted to a *de facto* merger or continuation, rather than a straight sale of assets for good consideration. The Third Circuit held a two party sale of assets amounted to a *de facto* merger where the seller ceased operation 18 months after sale, had few residual assets, and Plaintiff would have been denied a remedy if a *de facto* merger was not found. *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 371-373 (3d Cir. 1974).

By contrast, the transaction that took place between the Squibb Subsidiary and Weck was an actual merger with all premerger liabilities retained by Weck, the surviving corporation. Subsequently, the doctrine of *de facto* merger is not applicable where the transaction constituted a valid *de jure* merger.

Courts also indicate a *de facto* merger is applicable to avoid injustice. *See, e.g. Fehl*, 433 F.Supp. at 945-46 (holding

> It is a general rule that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor, including those arising out of the former's tortious conduct. . . . Despite the general rule, in some limited situations where an avoidance of liability would be unjust, a purported sale of assets for cash or other consideration may be found to transfer liabilities of the predecessor corporation. A buyer may be found to have assumed the

selling corporation's liabilities, for example, if there has been a de facto merger or consolidation . . . If the seller corporation is absorbed into the buyer, and if the seller's stockholders continue to have an ownership interest in the buyer, a merger may be found even though statutory requirements were not followed. Similarly, if a new corporation is formed to acquire the assets of an existing corporation, which then ceases to exist, the successor may be found to be a mere continuation of the predecessor. "There is in effect but one corporation which merely changed its form and ordinarily ceases to exist upon the creation of the new corporation which is its successor.");

*In re Penn Central Securities Litigation*, 367 F.Supp. 1158, 1170 (E.D.Pa. 1973)(finding "the de facto merger doctrine is a judge-made device for avoiding patent injustice which might befall a party simply because a merger has been called something else.")

Weck has been in existence continually since 1970. At the time of the implant it was a wholly-owned subsidiary of Standard. From 1971 through 1993 it was a wholly-owned subsidiary of Squibb and later of BMS. Following the asset sale to Teleflex in 1993, Edward Weck & Co. changed its name to EWI, Corporation, and it has continued to exist as a wholly-owned subsidiary of BMS. Def. Ex. J. Plaintiff provided the Court with no evidence Weck was unable to meet premerger liabilities. Furthermore, she did not demonstrate Weck no longer exists. To the contrary, Weck does have a legal corporate existence under its new name of EWI, Corporation; is duly incorporated under the laws of Delaware; and is in good standing. Def. Ex. J, K.

Plaintiff has relied principally on the case of *Drug, Inc. v. Hunt*, 168 A. 87 (Del. 1933) to prove her claim of a *de facto* merger. Citing the *Drug* decision, Plaintiff claims the elements necessary to create a *de facto* merger are the following: 1) a transfer of all assets of the transferor corporation to the transferee corporation, 2) payment made in stock directly to the

14

shareholders of the transferor corporation causing them to become shareholders in the transferee corporation, and 3) an agreement for the transferee corporation to assume all the debts and liabilities of the transferor corporation up until the time of merger.

As to elements one and two, the *Drug* decision involved only a two party transaction styled as a sale of assets. In this case, while only two parties were involved in the Agreement and Plan of Merger, multiple parties were involved in the Stock Agreement. The transactions that took place between the parties do not fit into the elements Plaintiff sets forth. Furthermore, while Plaintiff and Defendant both agree the transferor corporation in this transaction was Weck, the parties do not agree who the transferee corporation is. Plaintiff believes it to be Squibb while Defendant believes it to be the Squibb Subsidiary. Regardless, the transaction does not fit element one because Weck never transferred any assets to Squibb or the Squibb Subsidiary; rather an actual merger took place between Weck and the Squibb Subsidiary. As to the second element, a stock payment did not take place, rather Weck and Squibb Beech-Nut exchanged shares of stock.

Plaintiff also failed to prove the third element. Plaintiff is wrong in her contention that Squibb implicitly accepted the day to day debts and liabilities of Weck. Rather, Squibb simply was seeking to protect its interest in the liabilities of Weck as a prospective stockholder of Weck (the surviving corporation). Furthermore, Weck made these warranties to Squibb, Squibb Beech-Nut and the Squibb Subsidiary. Moreover, Plaintiff's belief that portions of the Stock Agreement entitled "Survival of Representations and Warranties" (Def. Ex. F, p. 46-48)

represent the assumption of premerger liabilities by Squibb is unfounded. The interest of Squibb and Squibb Beech-Nut in retaining remedies against Standard for breach of warranty reflect their interest as stockholders of Weck (the surviving corporation). Lastly, the Assignment of Squibb's rights under the Stock Agreement to Squibb Beech-Nut is of no consequence because Squibb did not assume any liability under the Merger Agreement for the premerger acts of Weck. Therefore, the transaction cannot be characterized as a *de facto* merger.

### 3.     Reverse Triangular Merger

Defendant's believe what transpired between Squibb, Weck, and the Squibb Subsidiary can be most closely analogized to a reverse triangular merger. Although this Court is not making a finding of fact or conclusion of law that what actually transpired between these three corporations was a reverse triangular merger, the analogy is helpful to understanding the intricate details of the transaction.

A triangular merger permits A, the acquiring company, to acquire control of T, the target company, without A being a constituent corporation by forming a new Delaware subsidiary, (S), into which T is merged. Balotti and Finkelstein at §9.7. The stockholders of A do not have the right to vote on the merger, nor are they entitled to appraisal rights since A is not a constituent corporation. *Id.* As the sole stockholder of S, A votes all of the stock of S in favor of the merger. *Id.* The stockholders of T have the same rights as in a two-party merger. *Id.*

In a reverse triangular merger, the merger proceeds in the same manner as a triangular merger except S is merged into T, with T surviving. *Id.* at §9.8. The outstanding shares of stock of S (all of which are owned by A) are converted into shares of stock of T. *Id.* The shares of stock of T outstanding immediately before the effective time of the merger are converted into securities of A, cash or other consideration. *Id.* The advantage of this type of merger is that T will become a wholly-owned subsidiary of A without any change in its corporate existence. *Id.* Thus, the rights and obligations of T, the acquired corporation, are not transferred, assumed or affected. *Id.*

Applying the reverse triangular merger scenario to the case at hand, "A" represents Squibb, the acquiring company; "T" represents Weck, the target company; and "S" represents the Squibb Subsidiary, the Delaware subsidiary. First, the Squibb Subsidiary is merged into Weck, with Weck surviving. Next, the outstanding shares of stock of the Squibb Subsidiary (all of which are owned by Squibb) are converted into shares of stock of Weck. Then, the shares of stock of Weck outstanding immediately before the effective time of the merger are converted into securities of Squibb, cash or other consideration. This results in Weck becoming a wholly-owned subsidiary of Squibb without any change in its corporate existence. Thus, the rights and obligations of Weck, are not transferred, assumed or affected. This type of merger can be analogized to the agreements in 1971 between Squibb, Weck, and the Squibb Subsidiary. However, it is not necessary to formally label the transaction.

**4.    A Parent Corporation Is Not Liable For The Acts Of Its Wholly-Owned Subsidiary**

Because Squibb did not assume Weck's liability in its acquisition of Weck, this Court must next examine whether a parent corporation is liable for the actions of its wholly-owned subsidiary. This Court holds BMS is not liable for the actions of Weck for the following reasons.

Essentially, two general theories of liability exist under which a parent corporation may be held responsible for the obligations of its subsidiaries: alter ego and agency principles. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 658 F.Supp. 1061, 1084 (D. Del. 1987).

An alter ego relationship might exist where a corporate parent exercises complete domination and control over its subsidiary. *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 266 (D. Del 1989). A subsidiary corporation may also be deemed the alter ego of its corporate parent where there is a lack of attention to corporate formalities, such as where the assets of two entities are commingled, and their operations intertwined. *Id.* Furthermore, "fraud or something like it is required." *Id.* at 268.

Here, Plaintiff offers no evidence that Weck is the alter ego of Squibb. Plaintiff introduced no evidence Squibb exercised complete domination and control over Weck; no evidence the assets of the corporations were commingled or intertwined; and no evidence of culpable conduct or fraud on the part of Squibb.

Under the agency theory, "the issue of liability rests on the amount of control the parent corporation exercises over the actions of the subsidiary." *Phoenix Canada Oil Co. Ltd.*, 658

18

F.Supp. at 1084. Liability for the activities of the subsidiary will attach to the parent corporation only if the parent dominates those activities. *Id.* The factors to consider in determining whether "domination" exists include "stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets." *Id.* Furthermore the status of wholly-owned subsidiary to a parent corporation, alone does not make a subsidiary the agent of its parent. *Id.* at 1084-85 (concluding the parent corporations not liable for the activities of their subsidiaries).

Once again, Plaintiff provides no evidence that Weck is or was the agent of Squibb or BMS. Furthermore, at the time Plaintiff received her implants, Weck had not yet merged with the Squibb Subsidiary. Therefore, Weck could not have been the agent of Squibb or later of BMS. Lastly, Plaintiff took no exception to the principle that, under Delaware law, the parent company is not responsible for the pre-acquisition liabilities of its wholly-owned subsidiary. Pl. Brief, p. 5.

## IV. CONCLUSION

Defendant, Bristol-Myers Squibb, Co. is not liable for the acts of Edward Weck & Co. with respect to the mammary prostheses implanted in Plaintiff, Sandra J. Binder. Plaintiff voluntarily dismissed, with prejudice, Defendant MEC from this litigation on December 12, 2001. **Accordingly, Plaintiff's complaint is dismissed with prejudice against Defendant Bristol-Myers Squibb, Co.**

**SO ORDERED THIS 13TH DAY OF DECEMBER 2001.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

Copies mailed to:

Zane D. Smith
Robert Maucker
Zane Smith & Associates
415 North LaSalle Street, Suite 300
Chicago, Illinois 60610

Fred A. Smith, III
Anthony J. Anscombe
Ian N. Rothenberg
Sedgwick, Detert, Moran & Arnold
209 South LaSalle Street
Chicago, Illinois 60604-1202

Counsel for Plaintiff

Counsel for Defendants